*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0836**

State of Minnesota,
Respondent,

vs.

Johnathan Bernard Edwards,
Appellant.

**Filed May 23, 2016**
**Affirmed**
**Larkin, Judge**

Ramsey County District Court
File No. 62-CR-13-9489

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his conviction of first-degree sex trafficking, arguing that the district court erred by admitting hearsay statements, the statement of a nontestifying codefendant, and evidence of other bad acts. Appellant raises several additional issues in a pro se brief. We affirm.

## FACTS

Respondent State of Minnesota charged appellant Johnathan Bernard Edwards and Kauser Mohamoud Yusuf with first-degree sex trafficking. The complaint alleged that Backpage.com received an e-mail from a possible juvenile sex-trafficking victim. The e-mail referred to one of several ads that had been on the site and stated: "These pictures was taking of me and posted on backpage the people that posted them have been making me sleep with the guys that called I'm only 15 years old . . . Please help . . . ."

The police traced the origin of the ad to an Edmund Avenue address in Saint Paul. Officers went to the Edmund Avenue address and identified Edwards and Yusuf. Officers observed a black sheet separating a bedroom at the back of the house. The bedroom contained a blow-up mattress on the floor and several pairs of female thong underwear. Yusuf provided her phone number. The police learned that the phone number in the Backpage ad rolled over to the number Yusuf provided.

The officers located the 15-year-old victim, T.S. T.S. told the police that Edwards and Yusuf invited men to the Edmund Avenue address to have sex with her. The men paid Edwards or Yusuf for the sexual activity, but Edwards and Yusuf did not give T.S.

any of the money.  T.S. estimated that she had sex with 7 to 20 men a day at the Edmund Avenue address.

Edwards's and Yusuf's cases were joined for trial.  At trial, several of the state's witnesses testified regarding hearsay statements.  For example, Leah Mickschl, a registered nurse and case manager at Midwest Children's Resource Center, testified that after a child has been referred to the center, she interviews and physically examines the child.  The purpose of the interview is to "get a good history from the child about what has been happening, any medical or symptomatic concerns that they have, [and to] get a detailed history about what it is that happened, if anything" in order to make recommendations for treatment, including counseling, prescription medication, or other medical care.  Mickschl testified that she interviewed T.S. and recorded their conversation.  The state offered the recording as an exhibit, and Edwards objected on hearsay grounds.  The district court overruled Edwards's objection, reasoning that the recording contained "information that was obtained for purposes of medical treatment."

The state played the recording for the jury, which contained T.S.'s description of the alleged sex trafficking.  T.S. told Mickschl that Edwards took pictures of her with her clothes off.  T.S. said that Edwards and Yusuf took her to two hotels and that she stayed at one of them for approximately one week and at the other for approximately three days.  T.S. said that after the stay at the hotels, they went to Yusuf's house, where Edwards and Yusuf had her wear "pretty clothes" and arranged for men to have sex with her for money.

T.S.'s mother, T.H., testified that T.S. has a learning disability and a third-grade-level IQ. T.H. testified that she first learned that T.S. was engaged in prostitution when somebody called her on the phone and told her that T.S. "was prostituting." T.H. also testified that T.S. told her that men or women would pay for what they wanted to do to her or for what they wanted her to do to them. T.S. told T.H. that Edwards and Yusuf "prepare[d] her" for the sexual encounters. T.H. testified that Yusuf did T.S.'s hair, picked out an outfit, and got her ready while Edwards sat at the computer. T.S. told T.H. she had been with more than 200 men. Edwards did not object to this testimony.

T.S.'s cousin, L.W., testified that T.S. told her that Edwards and Yusuf were with T.S. at a hotel when an explicit photograph was taken of T.S. and another girl. L.W. also testified that T.S. told her that Edwards and Yusuf had a video recording of T.S. having sex after they had given her something that made her "not alert." L.W. testified that T.S. told her that Edwards would arrange for her to meet men, accompany her to the meetings, and "stick them up." Edwards did not object to this testimony.

T.S.'s stepmother, I.F., testified that T.S. told her that she was involved in prostitution with Edwards and Yusuf, who were helping her make money. I.F. testified that T.S. said that she was having sex with several men each night, Edwards and another man would keep the money, and after "there was no more people that needed services," Edwards would give her a cut. Edwards did not object to this testimony.

Saint Paul Police Officer Susan Elizabeth Hartnett testified that she interviewed T.S. on two occasions. Officer Hartnett testified that T.S. told her that Edwards and Yusuf took her to two motels and that Edwards took photographs of her that were used in

4

the Backpage ads. T.S. told Officer Hartnett that men called Edwards's phone in response to the ad, that she had sex with 7 to 20 men a day, and that Edwards would be on a couch behind a curtain during the sexual activity. Officer Hartnett further testified that T.S. said that she did not get to keep any of the money generated from her prostitution. Saint Paul Police Sergeant Sean Lohse-Johnson testified that he spoke with T.S., and T.S. told him that she had been "pimped out" by Edwards and Yusuf. Edwards did not object to this testimony.

The state also introduced, without objection, a notebook that T.S. had written in. T.S. testified that she wrote some of the entries in the notebook, but she denied writing others. The notebook also contained the following entry:

> . . . its funny how I made over $500 sense I been back and mfs aint gave me a dime . . . LMFAO damn that's f---ed up so Ima start taking my own mf call and charging wtf I want cause mfs aint giving me a dime so from here own out ima start giving mfs what I want they ass to mf have . . . .

The record is not clear as to whether T.S. acknowledged writing this entry or denied it.

Officer Hartnett also testified about statements Yusuf made when Officer Hartnett interviewed her. Yusuf generally denied that she was involved in trafficking T.S. Yusuf said that she hardly knew T.S., that she believed T.S. was 19 years old, and that T.S. rented a room in her house for one month but only stayed one week. Yusuf denied staying at any hotels during the relevant time period. Yusuf initially denied any knowledge of Backpage.com, but later said she used T.S.'s computer and saw that T.S. had put ads on Backpage. Yusuf denied posting any ads and said she had no idea how her phone number came to be listed in the ads. Officer Hartnett testified that after the

5

formal interview, Yusuf told her that she had not been completely honest and had not provided all the relevant information. After learning about the charge that she could be facing, Yusuf asked for "a deal" if she "came clean." Yusuf said she had left out a "whole lot of information" and would provide a full confession if she could get a deal. Edwards did not object to this testimony.

When T.S. testified at trial, she acknowledged that she knew Edwards and Yusuf, but denied that either one of them had anything to do with the Backpage ads. T.S. testified that she stole Yusuf's computer and phone and that she posted the ads herself. T.S. acknowledged that she had sex with men for money during the time that she was staying with Edwards and Yusuf and that she gave them money to help them purchase household items. But T.S. also testified that Edwards and Yusuf did not know that the money came from prostitution. T.S. testified that she did not tell L.W. or I.F. that Edwards and Yusuf facilitated her prostitution. T.S. also testified that she frequently lies.

The jury found Edwards guilty, and the district court sentenced him to serve 240 months in prison. This appeal follows.

**D E C I S I O N**

**I.**

Edwards contends that "the admission of voluminous amounts of inadmissible hearsay evidence deprived [him] of a fair trial." Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). Hearsay is admissible only when specifically allowed under the rules of evidence "or by other rules prescribed by the

6

Supreme Court or by the Legislature." Minn. R. Evid. 802. There are numerous exceptions to the hearsay rule. *See* Minn. R. Evid. 803 (listing 22 exceptions to hearsay exclusion), 807 (stating residual exception to hearsay exclusion).

*Objected-to Hearsay Statements*

Edwards contends that the district court erroneously ruled that T.S.'s statements to Mickschl were admissible as having been "obtained for purposes of medical treatment." Because Edwards objected to admission of this evidence, this court reviews for abuse of discretion. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted).

Minn. R. Evid. 803(4) provides that the following statements are not excluded by the hearsay rule, even if the declarant is available as a witness: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "The rationale behind the rule is the patient's belief that accuracy is essential to effective treatment." *State v. Robinson*, 718 N.W.2d 400, 404 (Minn. 2006) (quotation omitted).

In child-abuse cases, statements made for the purpose of medical diagnosis or treatment "are admissible . . . if the evidence suggests that the child knew she was speaking to medical personnel and that it was important she tell the truth." *State v.*

7

*Salazar*, 504 N.W.2d 774, 777 (Minn. 1993). A child sexual-abuse victim's statement identifying the abuser can be admissible under rule 803(4) "on the theory that the identity of the abuser is pertinent to treatment." *State v. Larson*, 453 N.W.2d 42, 47 (Minn. 1990) *judgment vacated on other grounds*, 498 U.S. 801, 111 S. Ct. 29 (1990); *see also United States v. DeNoyer*, 811 F.2d 436, 438 (8th Cir. 1987) (concluding that a statement was admissible under Fed. R. Evid. 803(4) and 803(24), reasoning that the identity of the abuser was pertinent to treatment because "[t]he exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser" (quotation omitted)).

In *Robinson*, the supreme court clarified that there is not a categorical rule of admissibility under the medical-diagnosis exception for out-of-court statements of child sexual-abuse victims identifying their abusers. 718 N.W.2d at 405. The supreme court explained that the relevant caselaw, including *Salazar* and *Larson*, "recognized the importance of examining each statement individually and applying the facts on a case-by-case basis." *Id*. The supreme court therefore declined to adopt a categorical rule of admissibility for statements identifying a perpetrator of domestic abuse under the medical-diagnosis exception. *Id*. at 405-07. Instead, the supreme court examined the record and found that the state did not present evidence—such as the assailant's pattern of coercion or violence or psychological abuse, the victim's seeking treatment for emotional or psychological harm, the nurses' concern for the victim's emotional or psychological well-being, or expert medical testimony—suggesting that the identity of the assailant was relevant to the diagnosis or treatment of the victim's injury. *Id*. at 407.

8

The supreme court held that "where, as here, there is an insufficient evidentiary foundation to establish that the identity of the person who caused an injury was reasonably pertinent to the medical diagnosis or treatment of that injury, the statement of identity is not admissible under Rule 803(4)."[1] *Id.*

Edwards argues that the "state offered no evidence for the proposition that T.S.'s naming of [him] and Yusuf was relevant to any . . . diagnosis or treatment." But Mickschl testified that the purpose of her interviews of children referred to the clinic is to "get a good history from the child about what has been happening" in order to make recommendations for treatment, including "counseling." *See DeNoyer*, 811 F.2d at 438 (reasoning that the identity of the abuser is pertinent to treatment because "[t]he exact nature and extent of the psychological problems which ensue from child abuse often depend on the identity of the abuser" (quotation omitted)).

Edwards further argues that his and Yusuf's identities were not pertinent to T.S.'s treatment because "T.S. did not accuse a particular person of sexually abusing her." We disagree. T.S. stayed with Edwards and Yusuf, and they facilitated her sexual abuse by multiple men on a daily basis. The identity of the individuals who arranged T.S.'s sexual exploitation is just as pertinent to T.S.'s treatment for any ensuing psychological problems as the identity of the random men who sexually abused her. In sum, there was a sufficient evidentiary foundation to establish that the identity of the people who

---

[1] The supreme court noted that it did not "foreclose the possibility that [it] might in the future adopt a properly limited categorical rule of admissibility under the medical exception to hearsay for statements of identification by victims of domestic violence." *Robinson*, 718 N.W.2d at 407.

9

prostituted T.S. was reasonably pertinent to T.S.'s related medical diagnosis and treatment.

Edwards also argues that the state did not establish that T.S. had a motive to tell the truth to obtain an accurate medical diagnosis. The record refutes that contention. Mickschl identified herself as a nurse and explained to T.S. that "the most important thing is that we're only gonna talk about things that are true and real and things that really happened. And that's important 'cause it kind of helps me decide how to do your checkup in a little while. And what tests we should run or not run . . . ." T.S. responded: "Okay." Thus, T.S. knew she was talking to a medical professional and that telling the truth was important to her treatment. *See Salazar*, 504 N.W.2d at 777 (stating that statements made for the purpose of medical diagnosis or treatment "are admissible . . . if the evidence suggests that the child knew she was speaking to medical personnel and that it was important she tell the truth"). For that reason, and because the identity of the individuals who prostituted T.S. was reasonably pertinent to her related medical diagnosis and treatment, the district court did not abuse its discretion by admitting T.S.'s statements to Mickschl under the medical-diagnosis exception to the hearsay rule.

*Unobjected-to Hearsay Statements*

Edwards contends that T.S.'s statements to T.H., L.W., I.F., Officer Hartnett, and Sergeant Lohse-Johnson, as well as the statement in the notebook, were inadmissible hearsay statements. Edwards did not object to the admission of these statements. Generally, an issue cannot be raised for the first time on appeal. *State v. Anderson*, 733 N.W.2d 128, 134 (Minn. 2007). Moreover, "[a]n objection must be specific as to the

10

grounds for challenge." *State v. Rodriguez*, 505 N.W.2d 373, 376 (Minn. App. 1993), *review denied* (Minn. Oct. 19, 1993). Nevertheless, an appellate court can review an issue not raised in the district court if there was plain error affecting substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). "[B]efore an appellate court reviews an unobjected-to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights." *Id.* "An error is plain if it was clear or obvious. Usually this is shown if the error contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006) (citations and quotations omitted). If these prongs are met, then the appellate court assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings. *Griller*, 583 N.W.2d at 740.

Admission of hearsay statements can be plain error if "the statements, by the application of well-settled law, constitute inadmissible hearsay." *Bernhardt v. State*, 684 N.W.2d 465, 476 (Minn. 2004). But the supreme court has cautioned:

> The number and variety of exceptions to the hearsay exclusion make objections to such testimony particularly important to the creation of a record of the trial court's decision-making process in either admitting or excluding a given statement. The complexity and subtlety of the operation of the hearsay rule and its exceptions make it particularly important that a full discussion of admissibility be conducted at trial.

*State v. Manthey*, 711 N.W.2d 498, 504 (Minn. 2006).

The state contends that "the statements were not so obviously inadmissible that the [district] court committed plain error in not interfering with defense counsel's failure to

11

object." The state argues that the statements could have been admissible under the residual exception to the hearsay rule, which provides:

> A statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Minn. R. Evid. 807.

Courts consider the totality of the circumstances when determining whether a statement has "sufficient guarantees of trustworthiness." *State v. Martinez*, 725 N.W.2d 733, 737-38 (Minn. 2007). For example, in *State v. Ortlepp*, the supreme court relied on the following factors in concluding that a statement had circumstantial guarantees of trustworthiness: (1) the witness was available for cross-examination, (2) the witness admitted making the statement, (3) the statement was against the witness's penal interest, and (4) the statement was consistent with other evidence introduced by the state. 363 N.W.2d 39, 44 (Minn. 1985). "[T]his court has found that the third *Ortlepp* factor may be satisfied even when a declarant's statement is not against the declarant's penal interest if the declarant is hostile to the state and supportive of the defendant." *State v. Plantin*, 682 N.W.2d 653, 659 (Minn. App. 2004), *review denied* (Minn. Sept. 29, 2004).

In this case, T.S. testified and was cross-examined at trial. T.S. denied her prior allegations and was generally supportive of Edwards and Yusuf. But T.S.'s out-of-court

12

statements were consistent with other evidence introduced by the state, including the admissible statement T.S. provided to Mickschl. In sum, if Edwards had objected and the admissibility of the statements had been argued, it is not clear or obvious that the statements would have been inadmissible under the residual exception to the hearsay rule. Edwards is therefore not entitled to relief under the plain-error standard of review.

## II.

Edwards contends that "the district court violated [his] right to be confronted with the witnesses against him when it admitted evidence of his non-testifying codefendant's statement to [the] police." Because Edwards did not object, this court reviews this issue for plain error. *See State v. Usee*, 800 N.W.2d 192, 196 (Minn. App. 2011) (reviewing admission of unobjected-to codefendant's statement inculpating defendant for plain error), *review denied* (Minn. Aug. 24, 2011).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. In *Bruton v. United States*, 391 U.S. 123, 135-37, 88 S. Ct. 1620, 1627-28 (1968), the Supreme Court established the rule that when "two defendants are tried jointly, the pretrial confession of one, which implicates the other defendant, cannot be admitted against the other defendant unless the confessing codefendant testifies at trial. Admitting such a confession when the codefendant does not testify is a violation of the other defendant's Confrontation Clause rights." *State v. Blanche*, 696 N.W.2d 351, 367 (Minn. 2005) (citation omitted). "[W]hile *Bruton*'s protections apply more broadly than just formal confessions, they

13

nevertheless require that the statement be a confession that is prejudicial to the defendant." *Id.* at 369.

Edwards argues that Yusuf's "claim to have lied to investigators about her non-involvement in T.S.'s prostitution and her offer to confess if given a deal was prejudicial to her and to [Edwards]." But Yusuf did not confess to the police, and she did not implicate Edwards. In fact, she denied any involvement in T.S.'s prostitution. It is not clear or obvious that Yusuf's offer to confess in exchange for a deal was inadmissible under *Bruton*. Thus, Edwards is not entitled to relief under the plain-error standard of review. *See Griller*, 583 N.W.2d at 740 (stating that "before an appellate court reviews an unobjected-to error, there must be . . . error . . . that is plain"); *see also Ramey*, 721 N.W.2d at 302 ("An error is plain if it was clear or obvious." (quotation omitted)).

**III.**

Edwards contends that the district court erred by admitting evidence regarding his alleged other bad acts. Specifically, L.W. testified that T.S. told her that Edwards "would have her meet up with gentlemen and he'd stick them up . . . ." Edwards did not object. The prosecutor asked another witness, B.M., if she was "aware of any prostitution activity or efforts by [Edwards] to engage either yourself or [T.S.] in prostitution?" B.M. responded: "With [T.S.], I'm not aware of that. And with myself, it was years ago. Like, I would have known better myself. But I declined both. I declined the offers." The prosecutor followed up: "So he tried to talk you into prostituting?" Edwards objected, then withdrew his objection. Next, the parties had an off-the-record discussion. Following the discussion, the prosecutor stated: "I'm going to withdraw that question."

14

Because Edwards did not object to L.W.'s testimony and withdrew his objection to B.M.'s testimony, we review for plain error. *See Griller*, 583 N.W.2d at 740.

Evidence of other bad acts is not admissible to prove that a defendant acted in conformity with his character. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). But the evidence may be admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Minn. R. Evid. 404(b). The supreme court has developed five requirements for admission of other-acts evidence:

> (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*State v. Ness*, 707 N.W.2d 676, 685-86 (Minn. 2006). The state did not comply with these requirements, and the district court did not address them. We therefore conclude that admission of testimony regarding the other bad acts is error that is plain. *See Ramey*, 721 N.W.2d at 302 ("An error is plain if it was clear or obvious." (quotation omitted)).

"The third prong [of the plain-error test], requiring that the error affect substantial rights, is satisfied if the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 741. "To determine whether the error had a significant effect on the jury's verdict, we review the strength of the State's case, the pervasiveness of the error, and whether the defendant had an opportunity to respond to the testimony." *State*

15

*v. Sontoya*, 788 N.W.2d 868, 873 (Minn. 2010). The defendant bears the burden of persuasion on the third prong, and it is a "heavy burden." *Griller*, 583 N.W.2d at 741.

We are not persuaded that admission of L.W.'s isolated statement that Edwards would "stick them up" and B.M.'s brief testimony that she declined an offer from Edwards "years ago" to prostitute herself affected the outcome of the case. Even though T.S. denied her earlier accusations at trial, her multiple, consistent out-of-court statements regarding Edwards's involvement in her sex trafficking provided strong evidence of Edwards's guilt. Edwards therefore has not met his heavy burden of showing that the error affected his substantial rights, and he is not entitled to relief.

**IV.**

Edwards contends that this court should reverse his conviction because the cumulative effect of the errors denied him a fair trial. He argues that "[t]he voluminous amount of hearsay, combined with the evidence of [his] alleged other bad acts and the violation of his constitutional right to be confronted with the witnesses against him, deprived [him] of a fair trial."

"[An a]ppellant is entitled to a new trial if the errors, when taken cumulatively, had the effect of denying [the] appellant a fair trial." *In re Welfare of D.D.R.*, 713 N.W.2d 891, 903 (Minn. App. 2006). But relief under the cumulative-error doctrine requires multiple errors. *See, e.g.*, *State v. Mayhorn*, 720 N.W.2d 776, 779 (Minn. 2006) (holding that the cumulative effect of 12 errors deprived the defendant of a fair trial); *State v. Peterson*, 530 N.W.2d 843, 848 (Minn. App. 1995) (concluding that the cumulative effect of three errors required reversal). Because Edwards has established

16

only one error—the admission of isolated references to prior bad acts—and those references did not impact the outcome of the case, we do not discern a basis for relief under our cumulative-error jurisprudence. *Cf. Peterson*, 530 N.W.2d at 846, 848 (concluding that the cumulative effect of the following errors required reversal: district court instructed jury to continue deliberating until it reached a unanimous verdict; appellant's confrontation rights were violated; and prosecutor engaged in misconduct during closing argument, which turned *Spreigl* evidence into improper substantive evidence).

## V.

Edwards raises multiple issues in a pro se supplemental brief. First, Edwards appears to contend that he never "knowingly waived" his right to challenge probable cause or the searches leading to the discovery of evidence used against him at trial. The legal basis for Edwards's assignment of error is not clear from his brief. "Assignment of error based on mere assertion and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection." *State v. Ouellette*, 740 N.W.2d 355, 361 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Dec. 19, 2007). Because we do not discern obvious prejudicial error, we deem this assignment of error waived.

Edwards contends that the district court erred "when it denied [his] constitutional right to have severance and ordered joinder with his codefendant Kauser Yusuf when there were 'antagonistic' defenses." But Edwards did not oppose joinder prior to trial and does not suggest that he moved for severance. We therefore review for plain error.

17

*See Griller*, 583 N.W.2d at 740 (stating that an appellate court can review an issue not raised in the district court if there was plain error affecting substantial rights).

Under Minn. R. Crim. P. 17.03, it is within the district court's discretion to order joinder when two or more defendants are charged with the same offense, but the court must consider: "(1) the nature of the offense charged; (2) the impact on the victim; (3) the potential prejudice to the defendant; and (4) the interests of justice." Minn. R. Crim. P. 17.03, subd. 2. Rule 17.03 also provides that "[t]he court must sever defendants during trial, with the defendant's consent or on a finding of manifest necessity, if the court determines severance is necessary to fairly determine the guilt or innocence of one or more of the defendants." Minn. R. Crim. P. 17.03, subd. 3(3).

Edwards argues that all of the evidence presented by the state implicated Yusuf and that "[t]here wasn't a shred of evidence the state presented supporting [its] claim that [he] was sex trafficking." The record does not support Edwards's contention. The state presented multiple, consistent out-of-court statements by T.S. regarding Edwards's involvement in her sex trafficking. Moreover, Edwards does not cite rule 17.03, address the rule's factors, or otherwise explain how the district court clearly, obviously, and impermissibly deviated from the rule. Edwards has therefore failed to demonstrate plain error. *See State v. Myhre*, ___ N.W.2d ___, ___, No. A14-0670, slip op. at 9 (Minn. Feb. 17, 2016) (stating that "[i]n order to meet the plain error standard, a criminal defendant must show that (1) there was an error, (2) the error was plain"); *Ramey*, 721 N.W.2d at 302 ("An error is plain if it was clear or obvious." (quotation omitted)).

Edwards contends that the district court "[a]llowed an intoxicated juror to continue with deliberations after he didn't show up for deliberations." The record does not support this contention. After a juror did not appear for deliberations, two sheriff's deputies went to his house and brought him to court. The district court questioned one of the deputies, who stated that the juror told him that "he had a headache last night after deliberations. He went home and he drank some vodka and overslept, and when he woke up it was past 10:00 in the morning, and he panicked and did not know what to do." The district court questioned the juror about his absence. The juror confirmed that he overslept and apologized to the court. The district court asked the juror several questions, such as whether he could be fair to both parties if he continued deliberating, whether anyone had tried to contact him about the case, whether anyone tried to scare him, and whether he was comfortable continuing with deliberations. The juror indicated that he could be fair, no one had tried to contact him or scare him, and that he was "fine" with continuing deliberations. The record does not suggest that the juror was intoxicated or that the district court or the parties believed that he may have been intoxicated. In fact, Edwards's attorney stated that Edwards had "no objection" to the juror continuing deliberations. We discern no error in the district court's decision to allow the juror to deliberate.

Edwards contends that "the jury may have reached a different conclusion regarding guilt or innocence had the state not committed prosecutorial misconduct in its opening and closing statements by misrepresenting the facts of the case which unequivocally had the potential to inflame the jurors, even though counsel failed to object

to the statements made." Edwards relies on several statements he claims the prosecutor made, such as "T.S. had been tested at a 4th or 5th grade level-mentally challenged" and "The state doesn't have to prove what doesn't exist."

Edwards did not object to the state's opening statement or closing argument and therefore "must establish both that [the alleged] misconduct constitutes error and that the error was plain." *State v. Wren*, 738 N.W.2d 378, 393 (Minn. 2007). "The defendant shows the error was plain if the error contravenes case law, a rule, or a standard of conduct." *Id.* (quotation omitted). "The prosecutor may argue all reasonable inferences from evidence in the record." *State v. Salitros*, 499 N.W.2d 815, 817 (Minn. 1993) (quotation omitted). The statements Edwards identifies are either supported by the record or are arguments based on reasonable inferences from the record. Edwards therefore has not established error.

Edwards contends that he received ineffective assistance of trial counsel because his counsel made an unauthorized implied admission of guilt, failed to properly investigate the case, failed to challenge an illegal search and seizure, failed to challenge probable cause, and failed to object to improper evidence at trial. To succeed on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 2064, 2068 (1984).

20

"Generally, an ineffective assistance of counsel claim should be raised in a postconviction petition for relief, rather than on direct appeal." *State v. Gustafson*, 610 N.W.2d 314, 321 (Minn. 2000). The reason for this general preference is that a "postconviction hearing provides the court with additional facts to explain the attorney's decisions, so as to properly consider whether a defense counsel's performance was deficient." *Id.* (quotation omitted). Without those additional facts, "any conclusions reached by [an appellate] court as to whether [a defendant's] attorney's assistance was deficient would be pure speculation." *Id.* But if the trial record is sufficiently developed such that an ineffectiveness claim can be decided based on that record, an appellate court may consider the claim on direct appeal. *Voorhees v. State*, 627 N.W.2d 642, 649 (Minn. 2001).

The trial record is not sufficiently developed to decide Edwards's ineffective-assistance-of-counsel claim on direct appeal. We hereby preserve Edwards's right to pursue his ineffective-assistance-of-counsel claim in a postconviction proceeding under the requirements and standards prescribed by law. *See State v. Jackson*, 726 N.W.2d 454, 463 (Minn. 2007) ("Jackson's claims about his counsel's investigation and witness contacts require consideration of facts not in the trial record. Accordingly, we deny those claims without prejudice to Jackson's right to raise them in a postconviction proceeding.").

Lastly, Edwards contends that the district court "imposed an unlawful sentence of 240 months which does not accurately represent the 'criminal [history] points' he had at the time the court imposed this unlawful sentence." The record does not support

21

Edwards's claim. Edwards argues that he should have received four criminal-history points based on prior convictions. He did: the sentencing worksheet shows that he was assigned four criminal-history points based on prior convictions.

Edwards also argues that he should not have received a custody-status point because he was not on probation or parole. But the presentence-investigation report shows that Edwards was placed on felony probation on May 24, 2012, for a period of ten years. Although Edwards was discharged from probation on January 22, 2013, the Minnesota Sentencing Guidelines state: "Early Discharge From Probation. Assign a custody point if the offender is discharged from probation but commits an offense within the initial period of probation pronounced by the court." Minn. Sent. Guidelines 2.B.2(4) (2012). The dates of offense for this case were from July 1, 2013, to November 24, 2013, which was within the initial ten-year period of probation pronounced by the court for Edwards's earlier conviction. Thus, Edwards properly received a custody-status point. Given Edwards's five criminal-history points and his conviction under a statute with a severity level of B, his 240-month sentence was within the presumptive range under the Minnesota Sentencing Guidelines. *See* Minn. Sent. Guidelines 4.B, 5.B (2012).

In his pro se reply brief, Edwards raises two new issues regarding the district court's denial of his motion for judgment of acquittal and the district court's jury instructions. Issues raised "for the first time in [an] appellant's reply brief [in a criminal case]," having not been raised in respondent's brief, are "not proper subject matter for [the] appellant's reply brief," and they may be deemed waived. *State v. Yang*, 774

N.W.2d 539, 558 (Minn. 2009).  We therefore do not consider the issues raised for the first time in Edwards's pro se reply brief.

**Affirmed.**